### IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| 1. RON GRAHAM,<br><br>                    Plaintiff<br>   v.<br><br>1. DEBRA HAALAND, Secretary of the United States Department of the Interior,<br><br>2. EDDIE STREATER, Regional Director, Eastern Oklahoma Region, Bureau of Indian Affairs<br><br>3. UNITED STATES DEPARTMENT OF THE INTERIOR,<br><br>4. THE MUSCOGEE (CREEK) NATION CITIZENSHIP BOARD, and<br><br>5. DAVID HILL, Principal Chief of the Muscogee (Creek) Nation, in His Official Capacity,<br><br>                Defendants. | Case No.: |

## **COMPLAINT**

Ron Graham (hereinafter referred to as "Plaintiff"), by and through his undersigned counsel, and for his complaint against Debra Haaland, Secretary of the United States Department of the Interior, Eddie Streater, Regional Director for the Eastern Oklahoma Region of the Bureau of Indian Affairs, the United States Department of the Interior (collectively referred to as the "Federal Defendants"); and the Muscogee (Creek) Nation Citizenship Board ("Citizenship Board"), and David Hill, Principal Chief of the Muscogee (Creek) Nation (hereinafter referred to as "Chief Hill" and together with the Citizenship Board, the "MCN Defendants") (collectively "Defendants"), alleges as follows:

## PRELIMINARY STATEMENT

1.      Plaintiff is an individual person whose direct lineal ancestors were listed on the final Dawes Rolls of 1906 as Creek Nation Freedmen ("Creek Freedmen" or "Freedmen") and citizens of the Muscogee Creek Nation ("MCN" or "Creek Nation").  Plaintiff Graham is a descendant of (1) individuals who were enslaved by MCN, (2) Creeks of "African Descent," (3) free "Africans" living as citizens of the Creek Nation, and/or (4) "mixed blood" Creek Nation citizens who were listed as Freedmen on the Dawes Rolls (collectively "Descendants" or "Creek Freedmen Descendants").

2.      Pursuant to Article 2 of the Creek Treaty of 1866 between the United States and the MCN, the Freedmen and Freedmen Descendants, regardless of their "blood" status "shall have and enjoy all the rights and privileges of native citizens" of the MCN.  Creek Treaty of 1866, Art. 2, June 14, 1866, 14 Stat. 785, 1866 WL 18777 (hereinafter "Treaty of 1866").

3.      Despite this ironclad legal relationship, made possible only by the MCN's exercise of its sovereignty, the MCN and its federal benefactors have perpetuated race-based discrimination and the badges of slavery by using the Freedmen Descendants' race and African ancestry to deny Plaintiff the rights and benefits of MCN citizenship.  The Federal Defendants and the MCN have excluded Creek Freedmen and their Descendants, including Plaintiff, from the rights guaranteed by the Treaty of 1866, including but not limited to the right of citizenship, right to vote, right to hold office, and right to be recognized for who they are: MCN citizens by birthright, heritage, history, and culture.  Plaintiff therefore brings this civil suit for declaratory and injunctive relief under the Constitution and laws of the United States to re-secure those rights and privileges, which the Defendants have wrongly denied.

2

## PARTIES

4.     Plaintiff Ron Graham is a direct lineal descendant of Theodore (Blue) Graham, Creek Freedmen NB Dawes Roll #671 who was named on the Dawes Rolls as a Creek Freedman.  Graham is Creek by lineage and is entitled to MCN citizenship pursuant to the Treaty of 1866 but has been denied enrollment.

5.     Defendant Debra Haaland is the Secretary of the Department of the Interior ("Secretary Haaland" or the "Secretary") and the principal government official responsible for the administration of tribal affairs and the operations of the Bureau of Indian Affairs ("BIA"), a bureau within the United States Department of Interior ("DOI").  Secretary Haaland is an officer of the United States.

6.     Defendant Eddie Streater is the Regional Director for Eastern Oklahoma Region of the BIA. Mr. Streater makes decisions on behalf of BIA, communicates policy, and oversees the programs of the BIA in eastern Oklahoma including those relating to the MCN.

7.     Defendant DOI is an agency of the United States government.  The DOI includes the BIA and is responsible for the operations of the BIA.

8.     David Hill is the Principal Chief of the MCN and the principal government official responsible for the enforcement of the MCN Constitution and protection of all citizens of the MCN.  Article V, Section 1 of the MCN Constitution vests all executive power of the MCN in the Principal Chief.

9.     The MCN Citizenship Board is the MCN body responsible for evaluating applications for citizenship to the MCN and determining citizenship eligibility.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331. This Court has jurisdiction to review agency action pursuant to the Administrative Procedure Act

("APA"), 5 U.S.C. §§ 702–703.  Plaintiff seeks declaratory relief pursuant to 28 U.S.C. §§ 2201–02.  Plaintiff seeks equitable relief pursuant to 28 U.S.C. § 1343.

11.     This action arises under the Constitution and laws of the United States, including but not limited to the Fifth, Thirteenth, and Fifteenth Amendments to the Constitution of the United States; the Treaty of 1866 between the United States and the Creek Nation, 14 Stat. 785; Pub. L. No. 91-495, 84 Stat. 1091 ("Act of 1970"); the Oklahoma Indian Welfare Act of 1936, 25 U.S.C. §5203 ("OIWA"); and the APA, 5 U.S.C. §§ 701, *et seq*.

12.     Jurisdiction over the Federal Defendants is proper because the Federal Defendants have caused injury in the Northern District of Oklahoma by their acts and omissions within the jurisdiction contravening the Treaty of 1866 and the Constitution of the United States.

13.     This Court has personal jurisdiction over Principal Chief Hill because Principal Chief Hill resides in, and can be served in, this district.

14.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b).

15.     The Federal Defendants have waived sovereign immunity to Plaintiff's claims in this Complaint through the APA and the United States' fiduciary and trustee obligations to the MCN and its rightful citizens.  Secretary Haaland has acted beyond her authority by violating or allowing violation of the Constitution and laws of the United States and the Treaty of 1866, as Plaintiff alleges in this Complaint.  Secretary Haaland therefore has no sovereign immunity under the doctrines established by *Ex Parte Young*, 209 U.S. 123 (1908), *Larsen v. Domestic and Foreign Commerce Corp.*, 337 U.S. 682 (1949), and *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971).

16.     The MCN Defendants have acted beyond the scope of their authority by violating, or allowing subordinate officials to violate, the Constitution and laws of the United States, and

the Treaty of 1866, as Plaintiff alleges in this Complaint. Principal Chief Hill and the

Citizenship Board therefore have no sovereign immunity under the doctrines established by *Ex*

*Parte Young*, 209 U.S. 123 (1908), *Fletcher v. United States*, 116 F.3d 1315 (10th Cir. 1997),

and *Vann v. United States Department of Interior*, 701 F.3d. 927 (D.C. Cir. 2012).

## ALLEGATIONS COMMON TO ALL COUNTS

### History of Muscogee Creek Nation and the Creek Freedman

17.     For more than four hundred years, the MCN included people of different "races,"

skin color, and national origins among its citizens. Only recently have the MCN and the Federal

Defendants perpetrated a policy of exclusion based upon race.

18.     Historically, the Creek Nation comprised a confederacy of separate towns, tribes,

and peoples throughout what is now the southeastern United States.[1]

19.     As colonists and eventually non-indigenous Americans began to inhabit this area,

these new residents sought to "civilize the Creek Indian." In the ensuing decades, the United

States continuously and repeatedly attempted to impose, often by force, its customs, economy,

religion, and political structure on indigenous groups such as the MCN.

20.     One American custom adopted by some Creek citizens was the plantation

economy and the reliance on chattel African slavery as a labor force.

21.     Along with enslaved Africans who were owned by MCN citizens, there were also

MCN citizens of African descent and free Blacks openly living as citizens of the MCN.

22.     All of these segments of MCN society were forcibly removed pursuant to the

Indian Removal Act of 1830, when the United States expelled the MCN from their traditional

---

[1] Among those peoples were the Yamassee or Jamassi who were reported to have been "immigrants from Africa prior to the European discovery of America." See, *United States Department of Interior Census Office, Extra Census Bulletin, Washington, D.C.: United States Census Printing Office (1894),* p. 27, attached as Exhibit 1.

homelands and sent them along the infamous Trail of Tears to live in Indian Territory, in what is now Oklahoma.

23.     The Federal Government removed the Creeks primarily by their traditional tribal "town," and it was the town "Miccos" or chiefs who kept the tribal rolls.  This allowed the MCN citizens who made it to Oklahoma to reestablish their towns.

24.     Removal was carried out by the U.S. military, and approximately 24,000 MCN citizens were forced to travel to Indian Territory by foot or riverboats.  Thousands of MCN citizens died of exposure, starvation, and disease on the way to Indian Territory as a result of the federal government's poor planning, disorganization, and indifference.

25.     Even after removal to Indian Territory, some MCN citizens continued to be enslavers until the Creek Treaty of 1866 abolished slavery in the Creek Nation.

### The Civil War and the Treaty of 1866

26.     In 1861, Union forces withdrew from Indian Territory and Confederate officials formally occupied the jurisdiction.

27.     Some Creeks, known as the "Lower/Southern Creeks," who had been more willing to adopt the plantation economy and other European customs, provided supplies, men, and support to the Confederacy, and even sent representatives to the Confederate Congress.

28.      Other Creeks, known as the "Upper/Loyal Creeks," who generally resisted cultural assimilation, provided supplies, men, and support for the Union.  A contingent of Loyal Creeks, which included a substantial "Black" Creek component, left their homes in Oklahoma, and moved to Kansas to flee Lower/Southern Creek soldiers and their Confederate allies.  The Battle of Honey Springs Creek was a major battle that occurred in Indian Territory during the

Civil War, and Upper/Loyal Creeks, including "Black" Creeks, valiantly fought against the Confederacy and their allies.

29.     In 1865, as the Civil War ended, President Andrew Johnson designated a commission to travel to Fort Smith, Arkansas to convene a council for the purpose of negotiating new treaties with the Creek and the other four tribes making up the so-called "Five Civilized Tribes": the Seminoles, Cherokees, Choctaws, and Chickasaws.

30.     The members of that commission declared that a treaty with the United States "must" contain certain stipulations, including that "[t]he institution of slavery, which has existed among several of the tribes, must be forthwith abolished, and measures taken for the unconditional emancipation of all persons held in bondage, and for their incorporation into the tribes on an equal footing with the original members, or suitably provided for."  Report of D.N. Cooley, *Southern Superintendence* 296, 298 (Oct. 30, 1865).

31.     In an exercise of its sovereignty, the MCN negotiated and executed the Treaty of 1866 with the United States.

32.     That Treaty of 1866 became the foundational legal document of the Creek Nation and established the modern MCN as it is known today.

33.     The Treaty of 1866 provides in pertinent part:

> [I]nasmuch as there are among the Creek many persons of African descent…it is stipulated that hereafter these persons, lawfully residing in said Creek country, under their laws and usages, or who have been thus residing in said country, and may return within one year from the ratification of this treaty, and their descendants and such others of the same race as may be permitted by the laws of said Nation to settle within the limits of the jurisdiction of the Creek Nation as citizens [thereof], shall have and enjoy all the rights and privileges of native citizens, including an equal interest in the soil and national funds; and the laws of said Nation shall be equally binding upon and give equal protection to all such persons . . . .

Treaty of 1866, Art. 2.

34.     Functionally identical clauses are in treaties executed by the Seminole, Cherokee, and Choctaw with the United States in 1866.

### MCN Post-Civil War and Pre-Dawes Rolls Enrollment

35.     Shortly after executing the Treaty of 1866, the MCN reorganized its government constitutional structure and in 1867, the MCN created a new and expansive constitution ("1867 Constitution").

36.     The 1867 Constitution, in conformance with the Treaty of 1866, did not discriminate against Creeks of African descent, Free Black, or Creek Freedmen citizens of MCN.

37.     Between 1867 and 1895, the MCN created numerous rolls of its citizens. None of these rolls created by the MCN contained or listed blood quantum, or singled out Creeks of African descent, "Free Black" MCN Citizens, or former enslaved Africans who were emancipated and accepted as Creek citizens pursuant to the Treaty of 1866.

38.     Between 1866 and 1906, Creeks of African descent were an essential part of the MCN community, as evidenced by their service in important and high positions in MCN government, and other areas of MCN life including Creek citizens like Sugar George, Judge Henry Reed, Harry Island, and Warrior Rentie.

### The Dawes Rolls

39.     In 1887, Congress passed the Dawes Act of 1887 ("Dawes Act").

40.     The stated purpose of the Dawes Act was to prepare Indian Territory for statehood and white settlement.  To this end, the Dawes Act authorized the forced transfer of most of the land owned corporately by the so-called Five Civilized Tribes (the Creek, Cherokee, Seminole, Chickasaw, and Choctaw nations) to individual tribal citizens.

41.     After the passage of the Dawes Act, Congress created the Dawes Commission in 1893.  Congress tasked the Dawes Commission with identifying all MCN citizens eligible for land allotment in what would come to be known as the Dawes Rolls.

42.     Congress then passed the Curtis Act of June 28, 1898, 30 Stat. 495, ("Curtis Act"), directing the Dawes Commission to create two lists of citizens of the Creek Nation who would be eligible for land allotment: (1) the "Creek Nation Creek Roll," which was purportedly only composed of Creek citizens with Creek blood; and (2) the "Creek Nation Freedmen Roll," which was purportedly only a roll of those citizens of the Creek Nation who were formerly enslaved Africans and devoid of any Creek blood.[2]

43.     The Dawes Commission, motivated by racism, used race and MCN citizens' physical appearance to segregate Creeks of African Descent, *i.e.*, "Creek Freedmen."  The "true" Creeks, in the Dawes Commission's estimation, were listed on the Creek Roll, also known as the "Blood Roll"; the Creek Freedmen (*i.e.,* individuals of African descent, regardless of whether they or their ancestors were previously enslaved in the MCN) were listed on the Creek Freedmen Roll.

44.     The Dawes Commission employed the hypo-descent rule, by which any individual with "one drop" of "Black blood" was to be considered Black and therefore belonged on the Freedmen Roll.

45.     The Dawes Commission therefore enrolled many Creeks of African descent on the Freedmen Roll, regardless of whether they or their ancestors were ever enslaved in the MCN or how much "Creek blood" they actually possessed.[3]

---

[2] *See* Felix S. Cohen, *Handbook of Federal Indian Law*, 431 (1982).
[3] "[I]n cases of mixed freedmen and Indian parents, which was common among the Creeks . . . the applicant was always enrolled as a 'freedmen'."  Kent Carter, *The Dawes Commission and the*

9

46.     Creek citizens enrolled on the Freedmen Roll and their descendants, in perpetuity, will always carry the ugly badge of slavery, regardless of whether the enrollees or their ancestors were ever enslaved.

## **Expulsion of Creek Freedmen and Divesture of Citizenship Rights**

47.     The MCN illegally ratified a constitution in 1979 ("1979 Constitution") with the express purpose of stripping Freedmen and Creek Freedmen Descendants of their MCN citizenship and rights in perpetuity.

48.     The MCN's intent to discriminate on the basis of race, to perpetuate the badges of slavery, and to subvert the intent and plain language of the Treaty of 1866 are evident in statements from proponents of the 1979 Constitution, such as then-MCN Principal Chief Claud Cox:

> When you go back to the old [1867] Constitution, you are licked before you start; because it doesn't talk about Indians, it talks about CITIZENS of the CREEK NATION. When you got down to the Allotment time, there were more that was non-Indians or half-blood or less, who outnumbered the full blood, all of these totaled about 11,000, and there were only 18,000 on the entire Roll; so there was only 9,000 above One-half blood. That's the reason, they lost control; the FULLBLOOD lost control. That's what we're fighting, this blood quantum, trying to get back and let the people control because under the old Constitution, you've lost before you ever started. There were three FREEDMAN bands that would outnumber you today as citizens. So if we want to keep the INDIAN in control we've got to take a good look at this thing and get us a Constitution that will keep the Creek Indian in Control.

MCN National Council Minutes, October 29, 1977 at 31.

49.     Freedmen and Freedmen Descendants were not permitted to participate in the process to ratify the 1979 MCN Constitution, violating Section 503 of the OIWA, 25 U.S.C. § 5203, in effect in 1979, as well as the Treaty of 1866.

---

*Allotment of the Five Civilized Tribes 1893–1914* (1999).  In fact, Dawes Commission personnel were instructed to look for and/or inquire if an MCN citizen had any African ancestry, and to place that individual on the so-called Freedmen roll.  *Id.*

50.     The Federal Defendants should never have recognized the 1979 Constitution or any purported MCN government formed pursuant to the illegal 1979 Constitution.  A government formed pursuant to an illegal constitution is itself illegal.

51.     The Defendants continue to violate the Treaty of 1866, the United States Constitution, and other laws of the United States so long as Plaintiff and other Freedmen Descendants are barred from MCN citizenship, and the Defendants continue to deny Plaintiff and other Freedmen Descendants the rights and benefits of MCN citizenship.


## Plaintiff's Exhaustion of Tribal Remedies

52.     On May 30, 2019, Plaintiff submitted an application for citizenship to the MCN Citizenship Office in the hopes that the MCN would reconsider its illegal refusal to honor its obligations under the Treaty of 1866 light of *Cherokee Nation v. Nash*, 267 F. Supp. 3d 86 (D.D.C. 2017).  The *Cherokee Nation* case ended with a decision upholding the citizenship rights of the descendants of people enslaved in the Cherokee Nation based on Article 8 of the Cherokee Treaty of 1866, which is functionally identical to Article 2 of the Creek Treaty of 1866.

53.     The MCN Citizenship Board denied Plaintiff's application on August 23, 2019.

54.     Plaintiff timely asked the MCN Citizenship Board to reexamine his application, and the MCN Citizenship Board reaffirmed its denial on September 26, 2019.

55.     On October 18, 2019, Plaintiff petitioned for review of the MCN Citizenship Board's decision in the MCN District Court.  Plaintiff previously pursued litigation of his MCN citizenship rights against the MCN in MCN court, culminating in a one-paragraph decision from the MCN Supreme Court in 2007 summarily upholding the denial of citizenship without addressing the citizenship provisions of the Treaty of 1866 in its decision.

11

56.    On January 21, 2020, the MCN District Court dismissed Plaintiff's petition and upheld the Citizenship Board's decision to deny Plaintiff's citizenship application.

57.    On January 24, 2020, Plaintiff filed a Notice of Appeal with the MCN Supreme Court.

58.    On September 17, 2020, the MCN Supreme Court affirmed the District Court's decision.  Again, the MCN Supreme Court refused to rule on the applicability of the citizenship provisions of the Treaty of 1866.

59.    Plaintiff has exhausted all tribal remedies available to pursue his claim to MCN citizenship.  Alternatively, Plaintiff's further pursuit of tribal remedies is futile.

**Federal Defendants' Ongoing Violation of the Treaty of 1866**

60.    The Federal Defendants have failed, and continue to fail, to take any action to protect or reinstate Creek Freedmen Descendants' citizenship rights in the MCN.

61.    The Treaty of 1866 is a bilateral agreement, binding both the MCN and the Federal Defendants to its terms.  Nevertheless, the Federal Defendants continue to violate that agreement by allowing an illegally formed MCN government to keep Creek Freedmen Descendants from taking their rightful place among the MCN citizenry.

62.    The United States affirmatively violates the Treaty of 1866 every time it engages the illegally formed MCN government as though it were legally formed, and even though the MCN continues to select its leaders in elections from which Creek Freedmen Descendants are barred, contrary to the explicit terms of the Treaty of 1866.  Creek Freedmen and Creek Freedmen Descendants have been barred from participating, as voters and candidates, in every MCN election since 1979 through the present.  For example, Chief Hill was elected in 2019

without the legal participation of Creek Freedmen Descendent voters.  And yet, the Federal

Defendants continue to recognize the Hill administration.

63.     Federal Defendants have an obligation to protect the Creek Freedmen

Descendants and refuse recognition of the MCN government until such time as Creek Freedmen

Descendants can fully exercise their MCN citizenship rights.  According to DOI precedent, the

"BIA has the authority and the responsibility to decline to recognize the results of a tribal

election when it finds that violation of the [Indian Civil Rights Act] has tainted the election

results."  *United Keetoowah Band of Creek Indians in Oklahoma v. Muskogee Area Director*, 22

IBIA 75, 83 (1992).  By continuing to recognize the MCN and its government, elected and

formed under the illegal 1979 Constitution, the DOI violates its own precedent and policy, and

breaches its responsibility to the Creek Freedmen Descendants pursuant to Article 2 of the Treaty

of 1866.

64.     The MCN has received and continues to receive federal funding distributed by the

DOI for the benefit of MCN citizens, including moneys distributed to MCN under the

Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), and the American Rescue

Plan.  Creek Freedmen Descendants are ineligible to benefit from any federal funding given to

the MCN.  For instance, Creek Freedmen Descendants were denied access to any of the benefits

available to other MCN citizens through combined $594 million provided under the CARES Act,

or the $421 million in American Rescue Plan fiscal recovery funds.

65.     On February 9, 2022, Plaintiff wrote a letter to Acting Regional Director

Constance M. Fox, requesting that the Eastern Oklahoma Region "conduct a full-scale

investigation on the legitimacy of the [Muscogee Creek Nation] Constitution" specifically

relating to the disenfranchisement of Freedmen descendants.

13

66.     On March 7, 2022, Defendant Streater responded, stating that the Eastern Oklahoma Office is "unaware of a final decision by the Nation refusing to enroll Freedmen descendants as tribal citizens based on any language in its constitution limiting citizenship to those Indian blood."

67.     On April 13, 2022, Plaintiff Graham responded, providing copies of letters denying citizenship sent by the MCN to Graham and other Freedmen descendants (attached as Exhibit A).

68.     Upon information and belief, the Federal Defendants have knowledge that Principal Chief Hill distributes funds under federal programs in a discriminatory manner and with discriminatory intent by excluding Creek Freedmen Descendants, including Plaintiff, from participation in and receipt of the benefits of the programs by virtue of their status as Freedmen Descendants.

69.     Plaintiff has no adequate remedy at law.

**The Treaty of 1866 is Binding on Both the MCN and the Federal Defendants**

70.     The Treaty of 1866 is a bilateral agreement negotiated and signed by two sovereign entities utilizing their sovereign executive and legislative governmental powers.  The validity of the agreement has not been contested by the MCN or the Federal Defendants.  The Treaty of 1866 constitutes the supreme law of the land regarding the MCN citizenship rights of Creek Freedmen Descendants.

71.     The U.S. Supreme Court has established that there must be "clear and plain evidence that Congress actually considered the conflict between its intended action on the one hand and Indian treaty rights on the other and chose to resolve that conflict by abrogating the treaty." *United States v. Dion*, 476 U.S. 734, 739-40 (1986).

14

72.     Restrictions on Indian Treaty abrogation are well-settled in U.S. Supreme Court precedent.  Treaty rights are too fundamental to be casually cast aside: "Congress may abrogate Indian treaty rights, but it must clearly express its intent to do so."  *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 202 (1999) (citations omitted).

73.     There has been no act of Congress expressing any intent to abrogate the Treaty of 1866 or Article 2 therein.

74.     The MCN cannot unilaterally extinguish the Freedmen's rights under the Treaty of 1866.  The MCN exercised its sovereignty to execute and bind itself to the terms of the Treaty of 1866, and the MCN cannot now, under the guise of sovereignty, claim the power to unilaterally withdraw its covenant to admit the Freedmen and their descendants as citizens of the MCN.

75.     DOI has at least twice taken the position that treaty provisions functionally identical to Article 2 of the Treaty of 1866 guarantee Freedmen Descendants citizenship in other similarly situated tribes—specifically the Seminole and the Cherokee—but has failed or refused to do so with regard to MCN.

76.     The District Court for the District of Columbia has already analyzed a treaty provision functionally identical to Article 2 of the Treaty of 1866 and found that it guaranteed Cherokee citizenship in the Cherokee Nation of Oklahoma.  *See Cherokee Nation v. Nash*, 267 F.Supp.3d 86 (D.D.C. 2017).

77.     In one of the most important Indian Law cases in United States history, *McGirt v. Oklahoma*, 140 S. Ct. 2452 (2020), the MCN argued that the Treaty of 1866 remains valid and binding in its entirety.  The Supreme Court of the United States agreed.

78.     Because Creek Freedmen are being denied citizenship in the MCN, they are unable to avail themselves of the benefit of having any potential criminal case against them adjudicated by the federal court system, as *McGirt* requires, instead of the racially discriminatory Oklahoma criminal justice system.[4]

79.     Since the *McGirt* ruling was handed down, the MCN has been using the affirmation of its treaty rights under the Treaty of 1866 to assert power over many affairs in the State of Oklahoma. Yet, at the same time, the MCN continues to refuse to adhere to Article II of the Treaty of 1866, which guarantees Creek Freedmen citizenship within MCN.   In fact, the MCN told the United States Supreme Court in an amicus brief supporting the *McGirt* decision that "there exists a solemn appreciation of the importance of abiding by the treaty [of 1866] promises vindicated by this Court."[5]  This hypocrisy is simply stunning.

80.     The Federal Defendants cannot abrogate a valid treaty, the supreme law of the land, by mere ministerial indifference to the Plaintiff's rights.  Every action the Federal Defendants take under the color of government-to-government relations with the MCN, or in providing assistance available only to duly formed tribal governments is a new breach of the Treaty of 1866, and a new violation of the Plaintiff's rights under the Treaty of 1866, the U.S. Constitution, and federal law.

---

[4] Overall African-Americans are imprisoned in state prisons almost five times the rate of European-Americans due to staggering racial disparities in arrests, prosecutions, and convictions. According to the recent "The Color of Justice: Racial and Ethnic Disparity in State Prisons" report by The Sentencing Project, Oklahoma imprisons more Black people per capita than any other state in the Union besides Wisconsin given their overall representation in the general population.
[5] November 16, 2021, MCN Amicus Brief in the State of Oklahoma v. Victory Manuel Castro-Huerta case No. 21-429

**FIRST CAUSE OF ACTION**
**Claim Against all Defendants**
**Violation of the U.S. Constitution and Federal Law**

81.     Plaintiff repeats and re-alleges the allegations contained in paragraphs 1–80 as if fully set forth herein.

82.     The Federal Defendants are in breach of the Treaty of 1866 and their duty to protect the citizenship rights of the Plaintiff, including without limitation his right to vote, his right to run for and hold office, and his right to equal access to all benefits arising from citizenship in the MCN.

83.     The United States has and will continue to disburse millions of dollars in federal funds to Principal Chief Hill's government, in violation of the Treaty of 1866.

84.     The MCN Defendants oversee and approve the continuing disenfranchisement of and denial of citizenship rights and benefits to the Creek Freedmen Descendants.

85.     Defendants' ongoing acts violate, without limitation, the United States Constitution, the Act of 1970, the OIWA, the Treaty of 1866, the Indian Civil Rights Act, and the Civil Rights Act of 1866.

86.     The Defendants have violated and continue to violate the Fifth, Thirteenth, and Fifteenth Amendments to the U.S. Constitution by perpetuating the badges of slavery and treating Plaintiff differently from other citizens of the MCN on the basis of race, or denying Plaintiff his right to citizenship in the MCN because of his classification as the descendants of former slaves or other individuals of African descent.

87.     By reason of the foregoing, a ripe and justiciable controversy exists, and Plaintiff has standing to assert his rights.  Plaintiff is entitled to declaratory and injunctive relief to assert and preserve his rights as a citizen of the Muscogee (Creek) Nation.

## SECOND CAUSE OF ACTION
### Claim Against Federal Defendants
### Judicial Review of Agency Action Under the APA

88.     Plaintiff repeats and re-alleges the allegations contained in paragraphs 1–87 as if fully set forth herein.

89.     The Federal Defendants are responsible for protecting the interests of the MCN and its citizens, including the interests of the Creek Freedmen Descendants.

90.     By recognizing James Hill as Principal Chief of the MCN, as well as other officials elected to office in illegal MCN elections, the Federal Defendants have approved the racially discriminatory and unlawful disenfranchisement of the Creek Freedmen Descendants.

91.     DOI precedent dictates that the "BIA has the authority and the responsibility to decline to recognize the results of a tribal election when it finds that violation of the [Indian Civil Rights Act] has tainted the election results." *United Keetoowah Bank of Creek Indians in Oklahoma v. Muskogee Area Director*, 22 IBIA 75, 83 (1992).  By failing to follow this precedent and other case law (e.g*., Seminole Nation of Oklahoma v. Norton*, 206 F.R.D. 1 (D.D.C. Sept. 27, 2001) and *Seminole Nation v. Norton*, 223 F. Supp. 2d 122 (D.D.C. 2002)), the Federal Defendants have discriminated against Plaintiff to his injury and prejudice.

92.     Plaintiff requires and requests a declaration, pursuant to 28 U.S.C. § 2201 that, pursuant to 5 U.S.C. § 701, et. seq., the complained-of actions and inactions of the Federal Defendants are arbitrary, capricious, an abuse of discretion, and not in accordance with law.

### THIRD CAUSE OF ACTION
### Claim Against Federal Defendants
### Due Process and Equal Protection

93.     Plaintiff repeats and re-alleges the allegations contained in paragraphs 1–92 as if fully set forth herein.

94.     The denial of benefits deriving from the funds distributed by the Federal Defendants to the MCN and the right to have any alleged crimes committed be adjudicated by the federal government and not the State of Oklahoma is a denial of equal protection of the laws, and thus deprives the Creek Freedmen Descendants of due process of law in violation of the Fifth Amendment of the U.S. Constitution.  There is no lawful reason for the denial of benefits deriving from the funds distributed by the United States to the MCN or for the denial of the opportunity to seek redress from criminal charges in federal court.

95.     As a result of the foregoing, Plaintiff is entitled to a declaratory judgment that Creek Freedmen Descendants are entitled to receive benefits deriving from the funds distributed by the United States to the MCN on the same basis as other citizens of the MCN.

96.     As a further result of the foregoing, Plaintiff is entitled to an injunction compelling the Federal Defendants to disapprove or withhold disbursements of federal funds or funds derived from MCN trust assets to the MCN, unless those disbursements benefit the Creek Freedmen Descendants on the same terms as the benefit offered to all other citizens of the MCN; and further, to condition any further release or payment of monies from federal funds or funds derived from MCN trust assets on the MCN's compliance with that directive.

## FOURTH CAUSE OF ACTION
## Claim Against MCN Defendants
## Violation of the U.S. Constitution and Federal Law

97.     Plaintiff repeats and re-alleges the allegations contained in paragraphs 1–96 as if set forth fully herein.

98.     Pursuant to *Ex Parte Young*, a federal court can enjoin tribal officers from acting unconstitutionally, either because their action violates the U.S. Constitution directly or because the tribal official's actions are contrary to federal law, which is the supreme law of the land.

99.     The MCN Defendants—who willfully and purposefully implements or enforces policies denying Creek Freedmen Descendants, including Plaintiff, the right to enroll as citizens of the MCN—violate the Plaintiff's rights and privileges that are guaranteed to him pursuant to the Treaty of 1866, OIWA 25 U.S.C. § 5203 and the Indian Civil Rights Act 25 U.S.C. §§ 1302, *et seq*.[6]

100.    The MCN Defendants' actions are ongoing and represent a gross deprivation of the Constitutional and Treaty of 1866 rights of Creek Freedmen Descendants, including Plaintiff's constitutional, statutory, and treaty rights.

101.    Plaintiff has actually or constructively exhausted all tribal remedies and has been unable to obtain his requested relief through tribal procedure.  Seeking redress with the MCN administratively and judicially has been proven to be a futile exercise.

---

[6] The purpose of Indian Civil Rights Act is to impose upon Native American tribal governments restrictions applicable to federal and state governments as well as to protect individual rights of Indians, while fostering tribal self-government and cultural identity. *See* Indian Civil Rights Act of 1968, 25 U.S.C.A. §§ 1302–1303; *see also*, *Wounded Head v. Tribal Council of Oglala Sioux Tribe of Pine Ridge Reservation*, 507 F.2d 1079 (8th Cir. 1975).

102.    By reason of the foregoing, a ripe and justiciable controversy exists, and Plaintiff has standing to assert his rights.

**<u>PRAYER FOR RELIEF</u>**

Plaintiff respectfully prays this Court will grant declaratory and injunctive as follows:

a.    Declaring that:

    i.    The Creek Freedmen Descendants are Creek citizens;

    ii.    The Treaty of 1866 guarantees all Creek Freedmen Descendants the right to full and equal citizenship in the MCN;

    iii.    The Creek Freedmen Descendants are legally indistinguishable from other citizens of the MCN pursuant to the Treaty of 1866; and

    iv.    As equal citizens of the MCN, the Creek Freedmen Descendants are entitled to all rights privileges, protections, and benefits arising from citizenship in the Creek Nation equally and on the same basis as all other MCN citizens, including, without limitation, the right to vote in MCN elections, the right to run for and hold MCN office, and the right to receive funds and benefits available to MCN citizens.

b.    Declaring that no federal statute or superseding treaty has modified the Creek Freedmen Descendants' citizenship rights as granted in the Creek Treaty of 1866.

c.    Declaring that no amendment to the MCN Constitution has modified or can modify the citizenship rights of Creek Freedmen Descendants because those rights are derived from the Treaty of 1866 and not the MCN Constitution.

d.    Declaring that the MCN Defendants' actions depriving Creek Freedmen of their full MCN citizenship rights, including without limitation the right to vote in MCN elections, run

for and hold MCN office, and receive funds and benefits on the same basis as all other MCN citizens, violate the Treaty of 1866.

      e.     Declaring the MCN 1979 Constitution void.

      f.     Declaring the designation or description "Creek Freedmen" a badge of slavery.

      g.     Enjoining the MCN Defendants from implementing or permitting any law, policy, practice, decision, statute, resolution, action, or policy, express or implied, that directly or indirectly:

            i.     Denies, impairs, or burdens the citizenship rights of the Creek Freedmen Descendants;

            ii.     Prohibits, burdens, or prevents Creek Freedmen Descendants from enrolling in the MCN;

            iii.     Prohibits, burdens, or prevents Creek Freedmen Descendants from voting in future elections;

            iv.     Prohibits or prevents Creek Freedmen Descendants from running for or holding MCN office;

            v.     Prohibits or prevents the evaluation of Creek Freedmen Descendants' citizenship applications in accordance with the Thirteenth Amendment to the U.S. Constitution and the Treaty of 1866;

            vi.     Denies Creek Freedmen Descendants the right to access federal funds distributed to the MCN for the benefit of all MCN citizens; or

            vii.     Operates to disenfranchise or otherwise diminish, or burden the exercise of the MCN citizenship rights of the Creek Freedmen Descendants.

      h.     Declaring that:

      i.      The Federal Defendants have a duty to protect the MCN citizenship rights of the Creek Freedmen Descendants; and

      ii.      The United States, in its capacity as fiduciary and trustee, may not approve any act, law, policy, decision, practice, or commission by the MCN, its elected officials, its courts, or agents that denies, burdens, or diminishes the rights of Creek Freedmen Descendant citizens.

i.      Directing the BIA to appoint a trustee to ensure that the civil rights of the Creek Freedmen are not violated in the future.

j.      Enjoining Federal Defendants from approving disbursements from funds distributed by the United States to the MCN, unless those disbursements benefit in the same manner, and to the same extent, the Creek Freedmen Descendants on the same terms as they benefit all other citizens of the MCN.

k.      Enjoining Federal Defendants from recognizing or benefiting any MCN government, or any action of the MCN government, until the MCN government is constituted with the full and fair participation of Creek Freedman on a basis equal to that of all other MCN citizens under a constitution ratified in an election open to Creek Freedmen in compliance with the Treaty of 1866, the U.S. Constitution, the Indian Civil Rights Act, Oklahoma Indian Welfare Act, 25 U.S.C. § 5203, the Fifth Amendment, the Thirteenth Amendment, and the Act of 1970.

l.      Awarding attorneys' fees, disbursements, and costs pursuant to 42 U.S.C. § 1988(b) and any other applicable provisions of law.

m.      Providing any and all further relief this Court deems just and equitable.

Dated: September 16, 2022

Respectfully submitted,

_____
Damario Solomon-Simmons, OBA# 20340
Kymberli J. M. Heckenkemper, OBA # 33524
601 S. Boulder, 600
Tulsa, Oklahoma, 74119
(918) 551-8999 - Phone
(918) 582-6106 - Facsimile
dss@solomonsimmons.com
kheckenkemper@solomonsimmons.com

Nessa Horewitch Coppinger,
(*pro hac vice to be submitted*)
Graham C. Zorn,
(*pro hac vice to be submitted*)
BEVERIDGE & DIAMOND P.C.
1900 N St NW, Suite 100
Washington, DC 20036
Phone: (202)789-6000 Fax: (202)789-6190
ncoppinger@bdlaw.com
gzorn@bdlaw.com

M. David Riggs, OBA #7583
RIGGS, ABNEY, NEAL, TURPEN,
ORBISON & LEWIS
502 West 6th Street
Tulsa, Oklahoma 74119
(918) 587-3161 - Phone
(918) 587-9708 – Facsimile
driggs@riggsabney.com